**EXHIBIT A**

FILED
2025 FEB 03 12:59 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 25-2-03204-3 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY**

| | |
|---|---|
| KELLY STONELAKE, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>META Platforms, Inc. a Delaware<br>Corporation<br><br>        Defendant. | No.<br><br>COMPLAINT FOR DAMAGES |

## I.  INTRODUCTION

Plaintiff Kelly Stonelake brings this action against her former employer Meta Platforms Inc. ("Meta") for sex discrimination and retaliation under the Washington Law Against Discrimination, RCW 49.60 et. seq., and retaliation for opposing Meta's illegal activity and violations of public policy.

Ms. Stonelake had a distinguished 15-year career at Meta, rising through the ranks while consistently delivering exceptional results. From 2021 to 2022, she led critical third-party data protection and compliance initiatives that helped Meta avoid $10 billion in potential FTC fines and protected users from another Cambridge Analytica, until she was retaliated against for surfacing safety issues to the otherwise all male leadership team, despite this being a core expectation of her job. This became the final

COMPLAINT FOR DAMAGES - 1

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

1 straw in Ms. Stonelake's experience of persistent discrimination and different standards
2 than her male colleagues throughout her career.

3 The pattern began early: in 2011, when she was 23, just three months after
4 attending her wedding, Ms. Stonelake's boss sexually assaulted her during a business
5 trip and on a separate business trip told her she wouldn't be promoted unless she had
6 sex with him. She moved from California to Washington to escape him.

7 Over the next decade, she rose in the ranks and excelled in her roles at Meta,
8 but this pattern continued: over the next thirteen years, Ms. Stonelake would go on to
9 experience offensive, sexist comments from colleagues and clients and be held to
10 different standards by multiple other male bosses in separate organizations within
11 Meta. The company dismissed her complaints and took no action. A decade later, in
12 2020, after she questioned her boss's "Blue Lives Matter" profile picture following
13 George Floyd's murder due to the negative impact she feared it would have on their
14 large and diverse team, he met her with immediate hostility and retaliation and blocked
15 her from an earned promotion.

16 In 2022, while leading Meta's Horizon virtual reality platform expansion, Ms.
17 Stonelake identified serious product stability issues and product safety issues that put
18 children at risk of immediate exposure to hate speech, sexual harassment, and
19 bullying. Ms. Stonelake was being asked to lead the "go to market" on a.) expanding
20 Horizon to teens, b.) expanding Horizon internationally, and c.) expanding Horizon onto
21 mobile surfaces like phones and tablets, but the product was not ready for these steps
22 and therefore Ms. Stonelake's job required her to intervene.

23 When she supported another female leader's call for a quality pause on the roll-
24 out, Meta's Horizon Leadership Team first ordered Ms. Stonelake to silence her female
25 colleague. When she refused and instead supported this colleague's concerns, they
26 excluded her from the weekly leadership meetings. Not long after, the same leadership

COMPLAINT FOR DAMAGES - 2

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

team, now all-male in her absence, implemented the pause she had advocated for, without acknowledgment. They branded it a "Quality Lockdown" and made public statements, but failed to mention the safety issues.

In January 2023, Ms. Stonelake was explicitly told she would be denied a promotion because documenting her achievements would expose failures by male leaders whose support she needed. Approximately a year earlier, she had been told the same thing, after stepping in to lead the company through a crisis not of her making. The mounting pressure of years of relentlessly working to advance Meta's interest, while facing increasing marginalization within the company due to her fights for user safety and a fair workplace required Ms. Stonelake to take emergency medical leave in February 2023 due to feelings of depression and the sudden, strong desire to end her life. While completing an intensive outpatient program to address the suicidality that began as a result of her years of treatment at Meta, she was notified in September of 2023 that she would be laid off, and her final day at Meta was in January 2024.

This case seeks to expose and reform Meta's toxic pattern of silencing women who identify problems and protect users, then retaliating against them for doing their jobs. When companies punish women for surfacing critical safety and compliance issues, it creates dangerous blind spots that ultimately harm the most vulnerable users. Through this action, Ms. Stonelake aims to create accountability and systemic change to ensure other women at Meta do not face the same impossible choice between career advancement and doing what's right.

## II.    PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Kelly Stonelake is a former employee of Defendant Meta Platforms, Inc. She resides in King County, Washington and was employed by Defendant Meta in King County.

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

2. Defendant Meta Platforms, Inc. is a Delaware corporation doing business in King County and throughout the State of Washington.

3. Venue is proper in King County because Defendant transacts business in King County, and because during the time period at issue Plaintiff worked for Defendant in King County.

4. Jurisdiction and venue are proper pursuant to RCW 4.12.020(3) and RCW 4.12.25(1) and (3).

## III. FACTUAL ALLEGATIONS

### A. Ms. Stonelake was recruited to Facebook in 2008 by Dave Morin, and helped build out Facebook Platform

5. Ms. Stonelake began working at Meta, then Facebook, in early 2009, in Palo Alto, California.

6. Ms. Stonelake was one of the first several hundred employees at Facebook and helped build out the company from the ground up. She was recruited to Facebook by Dave Morin, a co-creator of Facebook Platform, who she had worked with at Apple and who knew her capabilities and talent.

7. During her early time at Facebook, Ms. Stonelake worked on building the Developer Platform ecosystem, focused on creating opportunities for businesses through an open web approach. She developed relationships with developers worldwide who were creating innovative experiences aligned with Facebook's vision of a more open and connected world. Her role included setting and enforcing platform policies and regulations, and building operational systems. Ms. Stonelake represented the company at events like f8, SXSW, and CES.

8. From her initial role as a marketing specialist onward, Ms. Stonelake had consistently excellent performance. She rose quickly through the ranks of the company.

COMPLAINT FOR DAMAGES - 4

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

**B. Sex harassment began almost immediately and Ms. Stonelake was eventually forced to transfer to a role in Seattle to escape a harassing boss**

9. Like many early Facebook employees, Ms. Stonelake was witness to the rampant and unmanaged discrimination and unprofessionalism across the company, which fell hardest on the few female employees in a male-dominated workplace.

10. In her first week, a group of male engineers started a bet over how long it would take for Ms. Stonelake and her boyfriend to break up.

11. Ms. Stonelake overheard recruiting coordinators boast about reading job candidates' personal Facebook messages to determine if they were "legit or not."

12. In her first role, Ms. Stonelake was assigned a mentor, "NG," who Ms. Stonelake learned regularly took another of his mentees up to the roof to hook up. Ms. Stonelake kept her distance and did not take advantage of this mentorship.

13. A drunk male colleague, "NS," who had been the ring-leader of the bet over whether Ms. Stonelake and her boyfriend would break up, grabbed Ms. Stonelake's crotch over her pants at a weekly company sanctioned on-campus drinking event called "League" regularly attended by Mark Zuckerberg and Andrew Bosworth, as well as other Facebook executives. When she reacted, NS called it an accident and shamed Ms. Stonelake for reacting.

14. At one point, another male colleague, "MJ," 20 years her senior, told her not to speak during a meeting that she had prepared and was set to lead, ending his patronizing statement with "Don't say a word. Thanks, doll." Then, after he made humiliating comments about her and undermined her authority and credibility throughout the meeting with high-level partners at Intel, (e.g. referring to Ms Stonelake as a 'gum chewer who couldn't even buy pencils' and 'what does she know?!'), he did a 180 and handed it over to her, in front of the clients. Ms. Stonelake was surprised and confused, but successfully led the meeting

COMPLAINT FOR DAMAGES - 5

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

15. Other Facebook executives who had attended the meeting later complimented her performance. Meanwhile, MJ immediately called her manager, "MF," stating that she seemed "nervous" while presenting and should be fired.

16. When Ms. Stonelake disclosed MJ's behavior to MF, he brushed off her complaints. He told her to focus more on what she could do better than on what MJ could do differently. Ms. Stonelake asked MF to call MJ, and MF said that she needed to do it herself. Ms. Stonelake had a phone conversation with MJ, where he both apologized and marveled that she was even upset.

17. In hindsight, it was not a surprise that MF brushed off Ms. Stonelake's complaints of sex harassment. Because shortly thereafter, MF himself began to sexually harass her.

18. In 2011, three months after attending Ms. Stonelake's wedding as an invited guest, MF orchestrated a series of escalating harassment events during a business trip to Seattle. First, he took Ms. Stonelake to dinner at Umi Sushi, where he bought and poured wine for her, praised her capabilities and brilliance, and made disturbing personal revelations, including that he had a second child only so his first would not be alone when he left his wife, and that his daughter's name came from a location in Hawaii where he'd had a fling, and that his wife didn't know.

After dinner, MF escorted Ms. Stonelake to her room at the W Hotel Seattle under the pretense of reviewing materials for her presentation the next day. Despite Ms. Stonelake explicitly saying "no" and "stop" as MF attempted to force his tongue into her mouth, he pushed her onto the bed and put his hands down her pants, under her jeans and underwear. Ms. Stonelake remembers pushing him off of her and MF stumbling around her room at which point she must have passed out. She awoke to find MF fully clothed and sleeping on her bed, snoring loudly. She was also fully clothed. She screamed at him to leave and immediately called her husband.

COMPLAINT FOR DAMAGES - 6

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

19. Later that summer, on another business trip, in the basement bar of the W Union Square in New York City, NY, he told her she wouldn't be promoted unless she had sex with him. He bragged of his ongoing sexual relationships with young women when he worked at Snapple and CNN, referring to the behavior as the "fast track" for attractive women. Ms. Stonelake declined this offer and was not promoted.

20. MF continued harassing Ms. Stonelake and she told him that she would report him to HR if he didn't switch teams.

21. MF then pursued and landed an open leadership role in another marketing organization at Facebook, but the harassment continued and intensified, with male members of the partnering sales team frequently making jokes suggesting that they believed she'd had a consensual sexual relationship with MF, or taunting her for being out of MF's league. When MF saw Ms. Stonelake on campus or at company events, he'd engage in escalating patterns of communication including winks across the room, messages through internal communication channels, approaching Ms. Stonelake when she was speaking with mutual colleagues, or approaching Ms. Stonelake when she was alone.

22. Ms. Stonelake felt she had no choice but to seek to relocate to escape him.

23. She proposed to Facebook a move of her role to Seattle and moved in December 2012.

24. Ms. Stonelake eventually reported MF's harassment to multiple managers and colleagues.

25. No action was taken and MF remained at the company for several more years, with no consequences.

COMPLAINT FOR DAMAGES - 7

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

**C.    Ms. Stonelake shined in her role and quickly advanced, insulated somewhat from the ongoing sexism at Facebook by a strong mentor and boss**

26.    Meanwhile, Ms. Stonelake, who was a founding member of the team that became the Creative Shop, shined in her role.

27.    Between 2012 to 2017, Ms. Stonelake rose from IC4 to Director. She became a patent holder, traveled the globe consulting Fortune 500 CMOs on their biggest business challenges, and was an advertising luminary, serving as a judge for creative work around the world.

28.    Her ratings throughout that time were Exceeded Expectations (five times), Greatly Exceeded Expectations (four times), and Redefines Expectations (twice).

29.    For most of this time, she reported to TB, a leader who was an invaluable mentor, one of the strongest allies of her career.

**D.    In 2016, Ms. Stonelake began facing harassment and discrimination from her new manager and male colleagues.**

30.    In 2016, she began reporting to "ES." From the outset, ES was overtly hostile to Ms. Stonelake based on her sex. He constantly undermined and belittled her, regularly made sexist and offensive comments, overtly and tacitly condoned similar comments by his male reports, and held her to higher standards than her male counterparts.

31.    On one occasion at a company-wide business conference in San Francisco, ES had been drinking and, with his arm around Ms. Stonelake, asked, "How can I better support you?" Ms. Stonelake requested more genuine constructive feedback for growth. ES told Ms. Stonelake, "let me tell you about a woman I worked with at Leo Burnett who was the smartest, hardest working person at the agency, but she was old, and a mom, and no one liked her because every time she opened her mouth she was right and no one wants to work with a woman who is always right."

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

32.    Ms Stonelake complained about this comment to peers and managers, but nothing happened.

33.    When she confronted ES herself about the inappropriateness of the comment, he responded that he had told this story to other women (including "NL," who had recently left) on the team and "they were all grateful, so why aren't you?"

34.    During an offsite for ES's leadership team in Toronto, he hosted a "speed dating" style feedback round. Ms. Stonelake's male peer, "TG," used the opportunity to tell her that it's not fair to others in the group that she is smart. He told her that to be better liked and have better relationships she needs to act less smart.

35.    Ms. Stonelake went to ES for support, but he thought it was funny. She also reported this to LB, her HR Business Partner, who said she would talk to ES about it. Nothing ever happened.

36.    ES also subjected Ms. Stonelake to different standards than her male counterparts in the evaluation and promotion process.

37.    He made her write her own directorship promotion case and portfolio – a robust process which is supposed to be the manager's responsibility to compile - but did not make her male colleague, TG, write his.

38.    He also told Ms. Stonelake that TG needed to "land the plane" to get promoted, but for her to be promoted, she both needed to "lap [TG] and land the plane first." TG and Ms. Stonelake were not competing for a single seat.

39.    She pushed back against this obvious double standard and was met with hostility.

40.    In the summer of 2017, she attended the Cannes Festival for Creativity, representing the company and her team's work. Ms. Stonelake's work was shortlisted and Sheryl Sandberg and Johnathan Mildenhall celebrated her by name from stage. Later, at a party with a group of colleagues, a male executive in her management chain

COMPLAINT FOR DAMAGES - 9

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

said drunkedly, "Hey Kelly, what would your husband say if you called him right now and said that you fucked me?"

### E. Sexism forced Ms. Stonelake to turn down a valuable promotion in 2017

41. Later in 2017, Ms. Stonelake was invited to interview for a job in Singapore to lead Creative Shop in APAC (Asia Pacific - Asia, Australia, and New Zealand). The role would act as a peer to ES (who led Creative Shop in North America). It would have been a significant increase in scope, and was scoped as a D2 role.

42. During the interviews for the role, which Ms. Stonelake was later offered, she asked the sales leader in APAC, "DN," if he believed a woman could succeed in this role due to the open sexism and disregard for women she experienced on a recent business trip.

43. Namely, when traveling to Tokyo in fall of 2016, she was repeatedly interrupted by senior male clients from Amazon who were visiting from India who initially greeted Ms. Stonelake by looking her up and down and saying, "who put this one in charge?". During the meeting, Ms. Stonelake was finally forced to ask them not to interrupt her, at which point they began screaming and cursing at her. At the end of the meeting, two of the men asked for her phone number and promised to show her a good time around Tokyo. After the meeting, teams expressed care and concern, but did not suggest that they would step in or that anything would be done. Instead, they explained to Ms. Stonelake that this is "just how it is" for women in Asia.

44. In response to the question of whether or not a woman could succeed in the role, DN's response was "at least you're not Chinese."

45. Ms. Stonelake, who had been so excited about the opportunity that she had already put her kids on waitlists at International Schools in Singapore, was forced to decline the advancement opportunity.

COMPLAINT FOR DAMAGES - 10

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

**F.    By 2020, working under ES became untenable.**

46.    In January of 2020, Ms. Stonelake led a meeting at the Consumer Electronics Show in Las Vegas with the CMO of Samsung. In this meeting, ES fell asleep and Ms. Stonelake was required to have multiple clearing conversations with internal partners. Later, he took credit for the results of the meeting.

47.    In summer 2020, during nationwide protests following George Floyd's murder, ES changed his profile picture to a "Blue Lives Matter" image. Understanding this as a deliberate counter-movement to Black Lives Matter, and concerned about its impact on the diverse team they were leading, Ms. Stonelake initiated a conversation with ES about the implications of his action. His response was immediately hostile and retaliatory.

48.    As women often have to in a corporate setting, Ms. Stonelake tiptoed around his ego while also ensuring the message was clear, "I'm not sure if you know but the logo in your post is a blue lives matter flag.... Blue lives matters is considered a counter movement to BLM..." ES' initial response was, "I understand it."

49.    Later, when speaking in person, ES defended himself by saying "black boys start out innocent and between then and when they got shot by police, they're getting into gangs and getting into crime, and the real issues are with social services and education."

50.    Ms. Stonelake continued to try and engage in constructive dialogue with ES. He was uninterested and openly hostile to the conversation. He called Ms. Stonelake and another senior woman who had joined the call for accountability "a pen of pitbulls," "blood letters," and the "vipers den."

51.    In June 2020, Ms. Stonelake, along with others, emailed HR expressing concern about this series of events including the way ES was responding to them.

52.    On June 30, Ms. Stonelake met with Meta's investigations team and provided screenshots and documentation of the exchange between her and ES. After

COMPLAINT FOR DAMAGES - 11

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

her report to HR, Ms. Stonelake had a performance review with ES on August 6. He was seething with anger. He told her she had "run her mouth" and wasn't "likable." There were no formal performance ratings issued that half due to COVID, but even despite Ms. Stonelake's glowing upward and peer feedback and outstanding business performance, ES stated that if he had rated her he would have given her a "meets some" rating. He told her this is a consequence of her own actions and she should think twice next time. This threat was particularly egregious given Ms. Stonelake's and her team's outstanding performance, including internal Pulse employee satisfaction scores of 95% and strong feedback.

53. She reported this to HR but received no support.

54. The hostile work environment continued and on August 12, Ms. Stonelake took a month of COVID leave that the company offered employees as a benefit. She emailed her HR Business Partners LB and JM on September 12 before returning from leave, expressing her anxiety about the retaliation, and requesting the accommodation of a joint conversation between HR, Ms. Stonelake, and ES to clear the air, and not being required to meet 1:1 with ES until then. Her requests were denied.

**G.    Ms. Stonelake transferred to Facebook Platform, hoping for a fresh start, and with promises of a promotion path to D2**

55. Around the same time, Facebook executive Brian Boland contacted Ms. Stonelake to recruit her for an opportunity in his organization. She would be reporting to Brett Vogel leading important Platform and third-party data work in a strategic business function: product marketing management (PMM) for Developer Platform, the team she'd joined at Facebook originally.

56. In a September 12 email to Human Resources, Ms. Stonelake informed HR that she'd completed interviews for the PMM role while she'd been on leave. In the email she said, "I love Creative Shop but can't keep working with [ES]... As it stands

COMPLAINT FOR DAMAGES - 12

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

1  right now, I'm dreading coming back because of potential continued retaliatory
2  behavior." Still, no actions were taken.

3      57.   In light of the continued unfair treatment by ES and HR's refusal to take
4  steps to protect her or resolve the issues, Ms. Stonelake left the team she had spent a
5  decade building and switched to an entirely new function as the PMM Director for
6  Developer Platform.

7      58.   Her decision to make this particular leap was influenced heavily by
8  conversations with Mr. Boland and Mr. Vogel about this new role supporting a D2
9  scope. In her first full performance cycle as a PMM Director, Ms. Stonelake earned a
10 rating of Greatly Exceeds Expectations, which is reserved for the top 10% of the
11 company, and Mr. Vogel wrote, "Last half, you delivered impact through your significant
12 contributions to the effectiveness of the Developer Platform org and leadership team,
13 your contribution to product strategy, and your people management. Throughout, you
14 brought an uncommon passion and commitment to delivering great outcomes for the
15 developer audience you serve."

16     59.   Ms. Stonelake's performance review goes on to highlight areas of
17 individual impact, including playing a leading role in the development and execution of
18 f8 (Facebook's Marquee Developer event), and serving as Partnerships' "single
19 threaded owner for iOS14," where Ms. Stonelake performed a company-wide risk
20 assessment of the impact on Apple's changes to Meta's business, a project requiring
21 immense skill, judgment, and discretion.

22     60.   Ms. Stonelake was also recognized for her ability to work cross-
23 functionally with product and engineering leadership teams, where PMM was
24 embedded. Mr. Vogel states, "You established yourself as a strong member of the
25 Developer Platform leadership team and used it as an effective channel for increasing
26 rigor, bringing a developer-first mindset, and improving the health of the XFN. In the

COMPLAINT FOR DAMAGES - 13

words of the Partnerships VP: 'Kelly is simply amazing!!! Her joining the team brought fresh perspective but more importantly care and passion for our platform and the audiences investing in them!'"

61. This August 2021 review also recognizes additional contributions such as, "You organized and launched the Women of Developer Platform group,' and "You build a culture where differences are appreciated and valued." Mr. Vogel also quoted a peer review that said, ""Kelly is also a relentlessly strong ally and confidant for women and underrepresented communities across Developer Platform. She isn't afraid to call out bias when she sees it -- something I've never seen another leader do and which has incredible consequences on changing behavior and helping people identify and root out implicit bias."

62. Despite performing significantly above her expectations in a brand new role, after not receiving an earned promotion, and after being told the role she interviewed for supported a D2 scope, Ms. Stonelake was not promoted.

**H. At Platform, Ms. Stonelake insulated Meta from $10 billion in fines for non-compliance in the wake of the Cambridge Analytica crisis, but was not promoted like the men on her team.**

63. In 2019, Meta became subject to an FTC consent order due to repeated violations of consumer privacy rights, deceptive business practices, and its failure to comply with a prior 2012 FTC settlement. The enforcement action was driven by Meta's systemic misrepresentation of user data privacy, including its failure to restrict third-party access to personal information, most notably in the Cambridge Analytica scandal. Despite publicly assuring users that they controlled their data, Meta allowed external developers to harvest and misuse personal information without proper oversight.

64. These practices not only breached consumer trust but also violated federal law and the company's existing obligations under the FTC's prior consent decree.

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

65. To address these ongoing violations, the 2019 FTC consent order imposed a $5 billion non-compliance penalty and mandated a comprehensive, independent privacy compliance framework, including a Data Protection Assessment (DPA) requirement. This DPA, overseen by third-party auditors (Palantir), was designed to ensure that Meta systematically evaluates and mitigates privacy risks associated with its data collection, sharing, and retention practices. By requiring Meta to assess and document the effectiveness of its privacy controls, the FTC sought to enforce long-term structural reforms and prevent further deceptive practices.

66. The first round of DPA (DPA 1.0) launched in 2021 and was initially a catastrophe. It resulted in significant business interruption for hundreds of strategic partnership & advertising partners.

67. Ms. Stonelake and her team were not responsible for DPA 1.0, its roll-out, or the resulting crisis, but as soon as the crisis for Meta, partners, and users became clear, she took a leading role in the DPA 1.0 War Room in an effort to resolve the business impact.

68. Her effort began with round-the-clock, continuous work for the first 96 hours of the fire drill – and the effort continued for months. She did not sleep when thousands of Meta's partners were taking to the forums to understand why their app was disabled, and the ops team had no active forum managers – so she got into the forums personally – acknowledging the issue, directing partners to resources, resolving false positives, and more to ensure Meta was appropriately supporting its partners and maintaining community trust.

69. Where other executives created spreadsheets tracking the number of impacted Developers, Ms. Stonelake helped the Developers.

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

70.     During this crucial period, she and her team preserved millions in sales revenue, and resolved issues that were preventing thousands of apps from coming into compliance.

71.     She then led a cross-company effort to address the DPA 1.0 breakpoints in order to launch a successful DPA 2.0 (2022).

72.     BV captured much of this in Ms. Stonelake's H2 2021 Downward Review:

"You played a leading role in the Day 545 War Room, a critical company/FTC-level effort...you quickly broke down the issue and ensured these business apps were not impacted...you personally provided first-line support to a huge number of developers... engaging directly with them to address their questions and help them find resolution...this was selfless, scrappy work that had a material positive impact on our partners and set an important example for internal teams...you developed a creative workaround to a SEV that was preventing GCR-based developers from communicating with us and coming into compliance... engaged deeply with senior market-facing leaders from across MBG, ensuring they were appropriately supported and enabled...As a result of the War Room and your significant efforts, partners and internal teams were massively better enabled, false enforcements were significantly reduced, and nearly all of our key partners were brought into compliance."

73.     Ms. Stonelake expected to be promoted in Q1 2022 after this exceedingly hard work, exceptional results, and positive performance feedback. This promotion was something she and Mr. Vogel discussed multiple times. And especially after her work leading the war room, and after the previous performance cycle, she saw a promotion as a certainty.

74.     But she was not promoted, even though because of her team's exceptional performance, the men all around her – including 20% of her team, and Mr. Vogel himself – were promoted.

75.     Mr. Vogel, now a Vice President, told her that to get promoted, in addition to all of her core job scope, she not only needed to prove she could fix the DPA problem the first time (which she had not created, and was not in her scope), she must

COMPLAINT FOR DAMAGES - 16

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

also prove she could improve it the next time. He also explained that the DPA 1.0 rollout was a bad look, and when these things happen, "someone has to take the fall," and that "it's really hard to promote someone at this level who was so close to so many things going wrong."

76. Ms. Stonelake was crushed. The person who should have taken the fall would be the male VP, "BM," who had put DPA 1.0 in the hands of a senior IC, "KC," who was under-resourced. Ms. Stonelake respected and liked BM and wished him no ill-will, and at the same time did not want to take a pay cut for him.

77. She was also hurt and confused. She had a great deal of respect and professional admiration for Mr. Vogel and could not understand the gap between the picture he painted with his words, and the reality they both experienced.

78. Like ES had told her – in order for her to be promoted as a woman at Meta, she needed to "lap the man *and* land the plane first." And then she *still* might be the scapegoat.

### I. Ms. Stonelake put her head down, led DPA 2.0 to a landslide success, but was passed over for promotion yet again

79. In spite of this huge setback, Ms. Stonelake focused on doing the next right thing. She did not want accountability without control and advocated to assume ownership for DPA 2.0. She started by building out a team to lead this work.

80. She proposed "LY" should be her right-hand man in the rebuilding effort. LY was an M1 who had just been re-orged into her team, and had no direct Meta PMM experience but had worked in PMM adjacent roles. In his previous Meta role, she had worked directly with LY and he had been a consistently stand out partner who she trusted deeply to do the right thing. She was encouraged to hire a senior M2 or a Director, but Ms. Stonelake believed LY to have great potential and be underutilized, and knew he had what it took to solve this. Ms. Stonelake encountered a lot of push back at the idea of staffing a team for work of this magnitude under an M1. After being

COMPLAINT FOR DAMAGES - 17

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

1  told no multiple times, Ms. Stonelake met with Mr. Vogel and BM to discuss. Mr. Vogel
2  and BM asked if she'd bet her own career on LY, given that she was effectively doing
3  so when she could otherwise hire a strong M2 or Director for this role. Both men
4  encouraged Kelly to consider a more senior person from an optics standpoint,
5  suggesting it would be better for her and her growing team if she brought in a more
6  senior person. LY was an Asian American man, and Ms. Stonelake believed
7  unconscious bias was impacting the push back. Ms. Stonelake agreed to bet her career
8  so that LY could have an opportunity he deserved but would otherwise not receive. LY
9  did so well that he was promoted. Ms. Stonelake, again, was not.

10     81.    By February, Ms. Stonelake had organized a Virtual Team of leaders
11  across 23 functions to work together toward the multi-year north star goals for the
12  project.

13     82.    DPA 2.0 was a landslide success; it launched on time and resulted in 96%
14  on-time submission rates (+56% year over year), no unexpected adverse revenue
15  impact to Meta, and zero high-visibility partner escalations (versus hundreds in 2021).
16  There were no PMM or PM team departures due to burnout (versus 100% of the DPA
17  1.0 core team in 2021). It was a home run.

18     83.    LY was promoted for the work he did on this project - a case that was
19  supported by Ms. Stonelake, Mr. Vogel, and Ms. Stonelake's entire upline. From
20  September 2021 through December 2022, Ms. Stonelake had played a leading role in
21  insulating Meta from $10 billion in FTC Consent Order non-compliance fines. She had
22  done what Mr. Vogel demanded and then some. She had lapped the men and still
23  landed the plane.

24     84.    But they were promoted and she was not.

25

26

COMPLAINT FOR DAMAGES - 18

85.   Indeed, over the course of this project, Ms. Stonelake's male boss (Vogel), male report (LY), all of his eligible reports, and male peer (CS) most deeply involved with the project were promoted.

**J.    She was not. Ms. Stonelake was simultaneously supporting the Horizon PMM team, and began blowing the whistle about danger to children on the new platform**

86.   While all this was happening, in early 2022, Mr. Vogel accepted a new role as the PMM Director for the Metaverse organization within Reality Labs. When he moved, he took Ms. Stonelake and her team with him.

87.   Ms. Stonelake had been asked to take on additional scope and also lead the 20-person Horizon PMM team while their Director, Meaghan Fitzgerald, was on a 7-month long maternity leave. Ms. Stonelake approached the new opportunity with vigor and excitement as it was one of the most strategically critical initiatives at the company in the wake of Apple's iOS14 significantly disrupting Meta's advertising business.

88.   Horizon is Meta's virtual-reality operating system that is the social operating system for Oculus headsets.[1]

89.   Horizon had been initially released on Oculus, and Ms. Stonelake's job was to continue her role overseeing Developer Platform PMM while also leading Horizon through three major expansions: to teens, mobile, and internationally.

90.   At Meta, each product is operated like a 3-legged stool, one leg being Engineering, the other Product Management, and the third Product Marketing (PMM), which represents and supports all of the inbound (e.g. research, strategy) functions and outbound (e.g. marketing, events, PR) non-technical functions related to informing product development and taking that product to market.

91.   Upon assuming leadership of the Horizon PMM team, Ms. Stonelake initiated a comprehensive "listening tour," meeting with all team members, their direct

---

[1] Meta Horizon OS - Wikipedia.

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

reports, cross-functional partners, and key stakeholders. This systematic review revealed deeply troubling patterns of dysfunction, discrimination, and safety concerns:

92. The dysfunction and discrimination included that:

    a. Employees reported widespread fear and anxiety throughout the organization.

93. Jeff Lin, who led product design, routinely yelled and belittled employees for pushing back on him or other senior male leaders, with women being targeted.

    a. Women's work was summarily dismissed by male leadership regardless of quality or strategic importance, often being asked to prepare lengthy reviews and then begin brushed aside when the meeting came.

    b. Female employees reported feeling their voices were considered less valuable and that differential treatment was openly permitted

94. The safety issues included rampant hate speech and bullying on the platform, and inadequate parental controls, in violation of Meta's regulatory requirements. This meant that the many children who were already easily able to access the platform (even though it was marketed as 18+) were being subject to hate speech, sexual harassment, and bullying, often within minutes of beginning to play.

95. Ms. Stonelake's listening tour revealed feedback and concerns that users who created black avatars in Horizon were subjected to immediate and severe racist abuse: the leadership team was aware that in one test, it took an average of 34 seconds of entering the platform before users with black avatars were called racial slurs including the "N-word" and "monkey." This abuse was widespread and consistent, indicating a systemic pattern rather than isolated incidents. The harassment often began before users could even orient themselves to the virtual environment and the platform lacked basic mechanisms to prevent or address racist harassment.[2]

---

[2] These issues were later corroborated by researchers (Metaverse report May 2022.pdf).

COMPLAINT FOR DAMAGES - 20

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

96. Ms. Stonelake learned that safety features required by regulations were missing, privacy reviews were regularly held where executives called into question whether or not laws were mandatory, and tools for monitoring and moderating abusive behavior were inadequate.

97. The female marketing director, "KA," who was not on the product leadership team, had been advocating for a launch pause, but had been dismissed repeatedly by Vivek Sharma, Vishal Shah, and Jeff Lin, and the all-male Horizon product leadership team.

98. KA, a talented and seasoned leader in her field, told Ms. Stonelake that she did not feel like she could build a marketing plan in good faith, as she would be sending people to a product that did not meet the promises in the advertising, including parental and safety controls. She and her team were concerned about PR and legal blowback of launching and marketing a product that was failing usability tests on a daily basis. KA also told Ms. Stonelake that meeting with Jeff Lin was a source of distress for the junior women on her team, who often reported being treated with contempt by Mr. Lin.

99. Despite these concerns, Meta's leadership was aggressively pushing to: roll out Horizon to teenagers without adequate parental controls, launch on mobile platforms without adequate product quality, and expand into markets where the product did not meet local regulatory requirements.

**K.  Ms. Stonelake was boxed out of leadership meetings after blowing the whistle about Horizon safety issues**

100. Ms. Stonelake took over the mantle inside the Horizon product leadership meetings, and began vocally advocating for the need to pause the ship dates for teens, mobile, and international.

COMPLAINT FOR DAMAGES - 21

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

101. The male product leadership team, especially Jeff Lin, made fun of Ms. Stonelake and KA's concerns, even though the concerns proved to be incredibly valid, and it was core to Ms. Stonelake and KA's job expectations to surface these issues.

102. When Ms. Stonelake raised KA's concerns in a leadership meeting where she was the only woman present, saying "we need to discuss the concerns [KA] has been raising," Mr. Lin's immediate response was to say, "how fast can you shut her up?" He then laughed and said, "that's your job, now let's see if you're as good as they say you are."

103. Ms. Stonelake did not do so. And after she kept raising the issues in the leadership team meetings, Ms. Stonelake noticed the weekly Horizon Leadership Meetings soon disappeared from her calendar.

104. When Ms. Stonelake, who considered this could have been the result of an honest mistake, consulted with Vivek Sharma and Vishal Shah' admin team to reinstate the meeting, she was informed that Sharma and Shah had instituted a "no interim leader," policy. Ms. Stonelake scheduled live meetings to follow up, where it was explained that given how sensitive the matters discussed were, they were going to keep the room small.

105. When Ms. Stonelake surfaced this with Human Resources, including noting that she was the only female member of the leadership team, and that her job required her to drive influence in this room, HRBP SM explained that Sharma and Shah have autonomy over their leadership teams and felt a smaller room would be more secure. This explanation did not hold up. Ms. Stonelake was overseeing some of the most confidential work at the company, she was the only "interim leader," and at the time, the only female member of the leadership team.

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

106. Mr. Shah maintained this position even after Mr. Sharma left the company and Mr. Shah himself began regularly joining the leadership meetings in an interim capacity in Mr. Sharma's absence.

107. Ms. Stonelake was determined to continue raising these important issues, which were not only a responsibility of her role but also a moral responsibility given the safety and public policy concerns at issue. Ms. Stonelake loved the company and did not want to see Meta get into trouble or cause harm.

108. When initially barred from the leadership room, Ms. Stonelake's manager, Mr. Vogel, had been out of the office on a month-long sabbatical. Upon his return she asked for his support getting her back in the leadership room. He said that since they were new to the org, he didn't want to deal with the politics of that and best to just let him keep her looped in of important things.

109. After Ms. Stonelake was excluded for advocating a quality pause, Shah implemented the exact same pause, rebranded it a "quality lockdown," and received credit for the initiative. He positioned it to be mostly about product quality, downplaying the safety issues.

110. Ms. Stonelake focused on doing the next right thing for the company, its partners, and users – she aligned her team and resources in support of "Mr. Shah's" Quality Lockdown.

**L.     Ms. Stonelake warned executives about potential FTC liability from the redirection of crucial DPA resources to the Horizon launch, but she was shut down.**

111. During this period, Ms. Stonelake discovered that product leaders were attempting to redirect resources from Developer Platform's privacy and compliance team to accelerate Horizon's development. Specifically, they planned to reallocate members of the engineering and product teams responsible for executing Data Protection Assessment (DPA) and other privacy requirements to an organization

COMPLAINT FOR DAMAGES - 23

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

working on Horizon's infrastructure and stability issues. Ms. Stonelake wrote emails alerting executives to the risks and spoke up in multiple meetings warning this would risk $5 billion in FTC fines, put partners' business in jeopardy, and breach user trust. Despite the gravity of her warning, she was told she had "done her part" by raising concerns and should "move on to things within [her] control."

**M.    Ms. Stonelake was asked to serve as a "bias interrupter" and then chastised for calling out bias and unequal standards**

112.    Also in January 2023, Yvonne Cantrowitz (HRBP) and Mr. Vogel asked Ms. Stonelake if she would serve as Metaverse PMM's "Bias Interrupter" in the H2 2022 calibrations (mid-January). As Ms. Cantrowitz described, "the role of Bias Interrupter includes asking difficult questions, probing to better understand the rationale for proposed decisions, ensuring decisions are being made based on objective evidence and behaviors, and providing those in the room an opportunity to speak."

113.    Ms. Cantrowitz told Ms. Stonelake and the entire Metaverse PMM team that she was selected because she has a history of exhibiting these behaviors even without a formal expectation.

114.    Ms. Cantrowitz was correct. Ms. Stonelake used her political capital at Meta to advocate for women and underrepresented minorities who were routinely overlooked in performance calibrations and promotion cycles. She had actively pushed back on biased narratives that downplayed their contributions, advocated for their promotions in calibration discussions, and challenged decisions that would have otherwise perpetuated the existing inequities for many under-leveled or under-recognized, underrepresented colleagues including LW, JL, RW, AT, SB, TS, CS, PH, LY, NTB, JL, ED, CC, CL, KH, LS, and many more.

115.    This advocacy was not without professional risk: as Ms. Stonelake had learned, women in leadership who speak out against bias often face retaliation, marginalization, or are penalized for being perceived as "difficult." Despite these risks,

COMPLAINT FOR DAMAGES - 24

1  Ms. Stonelake remained committed to advancing equity within Meta, even as her own
2  career was hindered by the very same biases she worked to combat.

3      116.  It soon became apparent that this bias interrupter role and its pre-
4  meetings, emails, and trainings were meant to distract her and perhaps direct her
5  change-agent attention, and that she was not welcome to actually call out bias.

6      117.  Three of Ms. Stonelake's male peers came to the calibrations completely
7  unprepared, with no familiarity with the expectation grid or standards, and assigned
8  their male direct reports unprincipled superlative ratings with no basis in the established
9  expectation grid, such as ""he's just a superstar," "he deserves to be recognized for all
10  that effort," "he's just a great guy!" When asked to ground their ratings in the
11  expectation grid, they said they'd been too busy to consider it.

12      118.  These peers also claimed to be unfamiliar with the expectations grid for
13  their organization, despite having been responsible to submit the performance reviews
14  for their downlines based on that grid. Ms. Stonelake surfaced this issue and was told
15  by Mrs. Cantrowitz to "not dwell there."

16      119.  When Ms. Stonelake put forward a member of her team, PH, who was an
17  Asian man and an immigrant, for promotion, based on his performance two levels
18  above his comp band, Mr. Hutto said he agreed PH had an impressive year but that PH
19  seemed "hungry" enough to keep hustling, and asked if Ms. Stonelake thought PH
20  would keep working hard without the promotion.

21      120.  This did not deter Ms. Stonelake, but it did scare her. Ms. Stonelake
22  offered to meet with Mr. Hutto and his two teammates after the first day of calibrations,
23  in the interest of fairness for their reports and everyone else. Mr. Hutto accepted her
24  offer but once they were on the phone, he asked Ms. Stonelake if she would complete
25  the write-ups for his reports, which was a core expectation of Mr. Hutto's role. She
26  declined.

COMPLAINT FOR DAMAGES - 25

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

121. The next day, two of the three peers showed up unprepared again, so again Ms. Stonelake "called out bias." She was met with an eye-roll from Ms. Cantrowitz. Ms. Cantrowitz rudely told Ms. Stonelake to stop, that there "wasn't enough time" to have the discussion, and that her concerns would be handled offline.

122. Ms. Stonelake became upset and explained that she would not have agreed to be a bias interrupter if she was going to experience invalidation herself that merely perpetuated the bias. Ms. Stonelake uncharacteristically broke into frustrated tears and left the call a few minutes early.

123. Mr. Vogel called her immediately and offered to fly from San Francisco to Seattle to take her to dinner that evening. At that dinner he said, "you haven't seemed like yourself lately."

124. Ms. Stonelake hadn't felt like herself; her health was rapidly deteriorating.

125. At this dinner, Mr. Vogel told Ms. Stonelake that heading into calibrations, he would not be putting her forward for a promotion, so again she would not receive her well-earned promotion, despite her exceptional performance leading what had a few months prior been the full scope of two D1s.

126. Mr. Vogel explained that documenting Ms. Stonelake's accomplishments would expose the failures of male leaders whose support she needed for promotion, most importantly Mr. Shah. The boss of these male leaders, CTO Andrew Bosworth, would be in the room when her promotion case was discussed, creating what Mr. Vogel considered an impossible situation. He told her that "this is how it works" at senior levels, and that while it "didn't make sense," she would need to accept it. He promised to "make it right" in the future if she continued performing at her current level. He reassured her that he didn't think it would be difficult. At this dinner, Mr. Vogel apologized for not doing more to support her access to the leadership room she had been excluded from, and that he regretted it.

COMPLAINT FOR DAMAGES - 26

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

**N. Ms. Stonelake took emergency mental health leave soon after, and was ultimately laid off due to extended medical leave**

127. As she encountered obstacle after obstacle in her final years at Meta, Ms. Stonelake's cognitive dissonance between the company that she thought Meta was and the decisions that were actually being made, had been growing stronger by the day.

128. Between hitting the glass ceiling hard, experiencing chronic invalidation of her skills and accomplishments, sexism, and double standards, all against a backdrop of two years spent devoting grueling long hours completely to Meta's best interest, Ms. Stonelake's mental health struggles flared and became something unrecognizable.

129. In February 2023, she went on emergency mental health leave to cope with the severe effects of her treatment at Meta. She was in intensive outpatient treatment for many months due to acute suicidality and PTSD, including a year spent completing Dialectical Behavioral Therapy including the Prolonged Exposure ("DBT-PE") methodology of addressing PTSD, and a full treatment course of Transcranial Magnetic Stimulation.

130. During her medical leave, Ms. Stonelake's role was eliminated and she was offered an individual contributor role, the Builder Role that she and Mr. Vogel had designed, which she accepted.

131. But ultimately, the impact on Ms. Stonelake's mental health from Meta's culture and treatment was too severe and she was unable to return to work before the Builder Role was eliminated.

132. Ms. Stonelake was laid off from Meta, effective January 8, 2024.

133. Her career trajectory has been permanently damaged and she continues to engage in weekly individual therapy, group therapy, and occupational therapy to regain executive function skills that were lost after the damage she incurred at Meta.

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

134. Stonelake's severe mental health decline, initially understood as PTSD and major depressive disorder, was ultimately revealed to also be the result of autistic burnout—a neurological crisis unique to autistic individuals that occurs after prolonged exposure to chronic stress, forced masking, and ethical or cognitive dissonance in environments that fail to accommodate autistic needs. Autistic burnout is not simply exhaustion or stress; it is a profound and systemic shutdown that impairs cognitive function, executive ability, and emotional regulation, often leading to severe depression and suicidality.

135. For Ms. Stonelake, this burnout was exacerbated by the persistent ethical conflicts she was subjected to at Meta, where she was pressured to participate in decisions that directly contradicted her moral framework. Autistic individuals often have an exceptionally rigid sense of justice and an intense need for ethical consistency. The cognitive dissonance between Meta's public commitments to safety and integrity and the reality of deprioritizing user protections created a distressing and destabilizing conflict. Unlike neurotypical colleagues, who may have been able to compartmentalize these contradictions, Ms. Stonelake's autistic neurology made such dissonance untenable, leading to an overwhelming and inescapable state of mental distress. When Meta disregarded her attempts to raise critical safety concerns, she was not only professionally sidelined but neurologically harmed.

### O. Ms. Stonelake is one among multiple female Meta executives forced to take medical leave.

136. Ms. Stonelake witnessed and documented a pattern of systemic discrimination that resulted in the systematic removal of women from leadership roles.

137. Of the approximately 20 PMM directors and VPs in Reality Labs (Metaverse, Horizon, Meta RayBans, Oculus) in role as of November 2022, only four were women. By the time Ms. Stonelake went on medical leave in January 2023, she

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

1   was the third of these four women to leave the organization on an emergency medical
2   leave.

3      138. None of the women who left returned to Meta.

4      139. The exodus of female leaders was directly tied to Meta's hostile response
5   to women who raised concerns about product decisions. Both JP and AB, two of the
6   female leaders who left, had been mistreated after pushing back on critical product
7   decisions. This created a clear pattern: women who exercised their professional
8   judgment to protect Meta's interests were systematically pushed out if their
9   assessments challenged male leaders' preferred course of action.

## IV. CLAIMS

### Sex harassment under the Washington Law Against Discrimination, RCW 49.60

12      140. Plaintiff realleges and incorporates by reference as if fully set forth herein,
13   each and every allegation in the preceding paragraphs.

14      141. Defendant's employees, managers, and leaders subjected Ms. Stonelake
15   to a pattern of sex harassment throughout her employment that was offensive and
16   pervasive.

17      142. Management either participated in the conduct or knew about the conduct
18   and failed to take prompt and adequate corrective action.

19      143. As a proximate result of Defendant's unlawful actions, Ms. Stonelake lost
20   wages, RSUs, and benefits and suffered emotional harm.

### Sex discrimination under the Washington Law Against Discrimination, RCW 49.60

23      144. Plaintiff realleges and incorporates by reference as if fully set forth herein,
24   each and every allegation in the preceding paragraphs.

25      145. Defendant discriminated against Ms. Stonelake in the terms and
26   conditions of her employment because of her sex.

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

146. Defendant treated Ms. Stonelake differently than her male peers in the material terms of her employment, and in failing to promote her in 2022 and 2023.

147. As a proximate result of Defendant's unlawful actions, Ms. Stonelake lost wages and benefits and suffered emotional harm.

### Retaliation under the Washington Law Against Discrimination, RCW 49.60

148. Plaintiff realleges and incorporates by reference as if fully set forth herein, each and every allegation in the preceding paragraphs.

149. As alleged above, Plaintiff repeatedly raised complaints about bias and discrimination at Meta. Defendant retaliated against her for opposing discrimination in the form of poor performance reviews, refusal to reinstate her on the Horizon leadership team, and failure to promote her.

150. As a proximate result of Defendant's unlawful actions, Ms. Stonelake lost wages and benefits and suffered emotional harm.

### Retaliation in Violation of Public Policy, Under Common Law and RCW 49.44.211

151. Plaintiff realleges and incorporates by reference as if fully set forth herein, each and every allegation in the preceding paragraphs.

152. As alleged above, Plaintiff raised complaints about the severe safety threats on the Horizon platform to children, including bullying and hate speech, and inadequate safety and parental controls. Plaintiff also raised complaints about funds being diverted from regulatorily-required DPA risk protection activities to the Horizon mobilization.

153. Defendant retaliated against her by excluding her from the Horizon leadership team, refusing to reinstate her on the Horizon leadership team, and failing to promote her.

BRESKIN JOHNSON & TOWNSEND
600 STEWART ST. SUITE 901
SEATTLE, WA 98101

154.  As a proximate result of Defendant's unlawful actions, Ms. Stonelake lost wages and benefits and suffered emotional harm.

## V.   REQUEST FOR RELIEF

Plaintiff requests that the Court enter judgment against Defendant as follows:

a) Awarding Plaintiff the full measure of damages permitted by law;

b) Lost back pay, wages, and benefits in amounts to be established at the time of trial;

c) Lost front pay, future wages, benefits, and other compensation to be established at the time of trial;

d) Damages for emotional distress, in an amount to be established at trial;

e) Actual and reasonable attorneys' fees and litigation expenses under RCW 49.60 *et seq.*, RCW 49.48.030, and any other applicable statute;

f) Pre-judgment interest on Plaintiff's lost wages and benefits;

g) Post-judgment interest;

h) A supplemental award for adverse tax consequences; and

i) Such other equitable, legal, or additional relief as may be appropriate and just.


DATED this 3rd day of February, 2025

BRESKIN JOHNSON TOWNSEND, PLLC

By: */s Cynthia Heidelberg*
    Cynthia Heidelberg, WSBA 44121
    600 Stewart St., Suite 901
    Seattle, WA 98101
    (206) 652-8660 Telephone
    (206) 652-8290 Facsimile
    cheidelberg@bjtlegal.com

    *Attorney for Plaintiff*

ØŠ̌ÒÖ
G˞Í Á̋ÒÒÁ̈̈ŒJÁ̌T
S ṎÙW̄VŶ
Ù̌Ù̌̌̌ Ŵ̌V̌̌ŠÖ̌S
Ò̋ŠÒÖ
Ô̌Ò̈Ĵ̌ É̈̈Ḧ È-Ĥ̌ÙŒ

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING**

| | |
|---|---|
| STONELAKE | No. 25-2-03204-3 SEA |
| VS | **ORDER SETTING CIVIL CASE SCHEDULE** |
| META PLATFORMS, INC. | **ASSIGNED JUDGE: Samuel Chung, Dept. 15**<br>FILED DATE: 02/03/2025<br>TRIAL DATE:02/09/2026 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

## I. NOTICES

**NOTICE TO PLAINTIFF:**
The Plaintiff may serve a copy of this **Order Setting Case Schedule (*Schedule*)** on the Defendant(s) along with the **Summons and Complaint/Petition.** Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the **Summons and Complaint/Petition** or (2) service of the Defendant's first response to the **Complaint/Petition**, whether that response is a **Notice of Appearance**, a response, or a Civil Rule 12 (CR 12) motion. The **Schedule** may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLCR*] -- especially those referred to in this **Schedule**. In order to comply with the **Schedule**, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].

**You are required to give a copy of these documents to all parties in this case.**

# I. NOTICES (continued)

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD-PARTY COMPLAINTS:**
A filing fee of **$240** must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule. The court will review the confirmation of joinder document to determine if a hearing is required. If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of <u>all parties and claims</u> is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of <u>all parties and claims</u> is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

**ARBITRATION FILING <u>AND</u> TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and crossclaims have been filed. If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a $250 arbitration fee**. If a party seeks a trial de novo when an arbitration award is appealed, a fee of $400 and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
**All** parties will be assessed a fee authorized by King County Code 4A.630.020 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements <u>and/or</u> Local Civil Rule 41.

**King County Local Rules are available for viewing at <u>www.kingcounty.gov/courts/clerk.</u>**

## II. CASE SCHEDULE

| * | CASE EVENT | EVENT DATE |
|---|---|---|
| | Case Filed and Schedule Issued. | 02/03/2025 |
| * | Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*]. **$250 arbitration fee must be paid** | 07/14/2025 |
| * | **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration [*See KCLCR 4.2(a) and Notices on Page 2*]. | 07/14/2025 |
| | **DEADLINE** for Hearing Motions to Change Case Assignment Area [*KCLCR 82(e)*]. | 07/28/2025 |
| | **DEADLINE** for Disclosure of Possible Primary Witnesses [*See KCLCR 26(k)*]. | 09/08/2025 |
| | **DEADLINE** for Disclosure of Possible Additional Witnesses [*See KCLCR 26(k)*]. | 10/20/2025 |
| | **DEADLINE** for Jury Demand [*See KCLCR 38(b)(2)*]. | 11/03/2025 |
| | **DEADLINE** for a Change in Trial Date [*See KCLCR 40(e)(2)*]. | 11/03/2025 |
| | **DEADLINE** for Discovery Cutoff [*See KCLCR 37(g)*]. | 12/22/2025 |
| | **DEADLINE** for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | 01/12/2026 |
| | **DEADLINE**: Exchange Witness & Exhibit Lists & Documentary Exhibits [*KCLCR 4(j)*]. | 01/20/2026 |
| * | **DEADLINE** to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(1)*] | 01/20/2026 |
| | **DEADLINE** for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | 01/26/2026 |
| * | Joint Statement of Evidence [*See KCLCR 4 (k)*] | 02/02/2026 |
| | **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file proposed Findings of Fact and Conclusions of Law with the Clerk) | 02/02/2026 |
| | Trial Date [*See KCLCR 40*]. | 02/09/2026 |

*The * indicates a document that must be filed with the Superior Court Clerk's Office by the date shown.*

## III. ORDER

Pursuant to King County Local Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above.  Penalties, including but not limited to sanctions set forth in Local Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance.  It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.


DATED:     02/03/2025

_____
PRESIDING JUDGE

## IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE.**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case schedule. The assigned Superior Court Judge will preside over and manage this case for all pretrial matters.

**COMPLEX LITIGATION:** If you anticipate an unusually complex or lengthy trial, please notify the assigned court as soon as possible.

**APPLICABLE RULES:** Except as specifically modified below, all the provisions of King County Local Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges. The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**CASE SCHEDULE AND REQUIREMENTS:** Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

### A. Joint Confirmation regarding Trial Readiness Report
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the expected duration of the trial, whether a settlement conference has been held, and special problems and needs (e.g., interpreters, equipment).

The Joint Confirmation Regarding Trial Readiness form is available at www.kingcounty.gov/courts/scforms. If parties wish to request a CR 16 conference, they must contact the assigned court. Plaintiff's/petitioner's counsel is responsible for contacting the other parties regarding the report.

### B. Settlement/Mediation/ADR
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement demand. Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for defendant/respondent shall respond (with a counter offer, if appropriate).

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been held. FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY RESULT IN SANCTIONS.

### C. Trial
Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as convened by the court. The Friday before trial, the parties should access the court's civil standby calendar on the King County Superior Court website www.kingcounty.gov/courts/superiorcourt to confirm the trial judge assignment.

## MOTIONS PROCEDURES

### A. Noting of Motions

**Dispositive Motions:** All summary judgment or other dispositive motions will be heard with oral argument before the assigned judge. The moving party must arrange with the hearing judge a date and time for the hearing, consistent with the court rules. Local Civil Rule 7 and Local Civil Rule 56 govern procedures for summary judgment or other motions that dispose of the case in whole or in part. The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Non-dispositive Motions:** These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered. All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements.

Rather than noting a time of day, the Note for Motion should state "Without Oral Argument."  Local Civil Rule 7 governs these motions, which include discovery motions.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine, motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the assigned judge.  All other motions should be noted and heard on the Family Law Motions calendar.  Local Civil Rule 7 and King County Family Law Local Rules govern these procedures.  The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

**Emergency Motions:**  Under the court's local civil rules, emergency motions will usually be allowed only upon entry of an Order Shortening Time.  However, some emergency motions may be brought in the Ex Parte and Probate Department as expressly authorized by local rule.  In addition,  discovery disputes may be addressed by telephone call and without written motion, if the judge approves in advance.

**B.  Original Documents/Working Copies/ Filing of Documents:  All original documents must be filed with the Clerk's Office.**  Please see information on the Clerk's Office website at www.kingcounty.gov/courts/clerk regarding the requirement outlined in LGR 30 that attorneys must e-file documents in King County Superior Court.  The exceptions to the e-filing requirement are also available on the Clerk's Office website. The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

The working copies of all documents in support or opposition must be marked on the upper right corner of the first page with the date of consideration or hearing and the name of the assigned judge.  The assigned judge's working copies must be delivered to his/her courtroom or the Judges' mailroom.  Working copies of motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions Coordinator.  Working copies can be submitted through the Clerk's office E-Filing application at www.kingcounty.gov/courts/clerk/documents/eWC.

**Service of documents:** Pursuant to Local General Rule 30(b)(4)(B), e-filed documents shall be electronically served through the e-Service feature within the Clerk's eFiling application.  Pre-registration to accept e-service is required.  E-Service generates a record of service document that can be e-filed.  Please see the Clerk's office website at www.kingcounty.gov/courts/clerk/documents/efiling regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested relief with the working copy materials submitted on any motion.  **Do not file the original of the proposed order with the Clerk of the Court**.  Should any party desire a copy of the order as signed and filed by the judge, a pre-addressed, stamped envelope shall accompany the proposed order.  The court may distribute orders electronically.  Review the judge's website for information: www.kingcounty.gov/courts/SuperiorCourt/judges.

**Presentation of Orders for Signature:** All orders must be presented to the assigned judge or to the Ex Parte and Probate Department, in accordance with Local Civil Rules 40 and 40.1. Such orders, if presented to the Ex Parte and Probate Department, shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). If the assigned judge is absent, contact the assigned court for further instructions.  If another judge enters an order on the case, counsel is responsible for providing the assigned judge with a copy.

**Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented to the  Ex Parte and Probate Department.**  Such orders shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). Formal proof in Family Law cases must be scheduled before the assigned judge by contacting the bailiff, or formal proof may be entered in the Ex Parte Department.  **If final order and/or formal proof are entered in the Ex Parte and Probate Department, counsel is responsible for providing the assigned judge with a copy.**

**C. Form**

Pursuant to Local Civil Rule 7(b)(5)(B), the initial motion and opposing memorandum shall not exceed 4,200 words and reply memoranda shall not exceed 1,750 words without authorization of the court. The word count includes all portions of the document, including headings and footnotes, except 1) the caption; 2) table of contents and/or authorities, if any; and 3): the signature block. Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

***IT IS SO ORDERED. FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS. PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.***

_____
PRESIDING JUDGE

# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR COUNTY OF KING

| | |
|---|---|
| KELLY STONELAKE, an individual,<br><br>                Plaintiff,<br><br>    v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                Defendant. | Case No. 25-2-03204-3 SEA<br><br>NOTICE OF FILING NOTICE OF REMOVAL |

TO:          THE CLERK OF THE COURT

AND TO:      PLAINTIFF KELLY STONELAKE THROUGH HER COUNSEL OF RECORD

      Defendant Meta Platforms, Inc., by its attorneys and pursuant to 28 U.S.C. § 1332, 1441(a), and 1446, notifies you that on March 17, 2025, it filed in the United States District Court for the Western District of Washington Meta Platform, Inc.'s Notice of Removal of this action. A copy of the Notice of Removal and a copy of all current process, pleadings, and orders served are attached as Exhibit A.

      Pursuant to 28 U.S.C. § 1446(d), the Superior Court of the State of Washington, for the County of King, shall proceed no further with Case No. 25-2-03204-3 SEA, unless and until the case is remanded.

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, Washington 98104-4041
(206) 946-4910

DATED: March 17th, 2025

Respectfully submitted,

SEYFARTH SHAW LLP


By: */s/Lauren Parris Watts*
Lauren Parris Watts, WSBA No. 44064
999 Third Avenue, Suite 4700
Seattle, Washington  98104-4041
Telephone:  (206) 946-4910
Facsimile:  (206) 946-4901
lpwatts@seyfarth.com

*Counsel for Defendant*

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, Washington  98104-4041
(206) 946-4910

## CERTIFICATE OF SERVICE

I hereby certify that on March 17th, 2025, I have caused a true and correct copy of the foregoing Notice of Removal to be filed via the CM/ECF system, and to be served upon the following, via U.S. First Class Mail:

Cynthia Heidelberg
BRESKIN JOHNSON & TOWNSEND
600 Stewart St., Suite 901
Seattle, WA 98101
Phone: 206-652-8660
Email: cheidelberg@bjtlegal.com

DATED March 17th, 2025

*/s/Kathy Wheat*
Kathy Wheat, Legal Support Assistant

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, Washington 98104-4041
(206) 946-4910